Panton *v.* Norton et al.

---

HENRY PANTON, Plaintiff in Error, *v.* HIRAM NORTON *et al.*, Defendants in Error.

ERROR TO WILL.

It is erroneous, in an action on the case for obstructing the flow of water to a mill, and for filling the stream with corn cobs, so as to injure the use of the mill, to exclude such testimony from the jury as tends to prove the fact complained of. The law will presume that parties have knowledge of the action of currents of water, and the power of gravitation; and they will be held responsible for consequences and injuries resulting to others from the known action of laws of matter, in combination with the action of individuals, producing injuries.

If a party fills a stream, above the mill of another, with such substance as he knows will float into the mill race and impair the usefulness of the mill, he will be held answerable in an action on the case for the damage consequent upon the act.

The plaintiff sued defendants in the Will Circuit Court in case. The declaration contained two counts; the first alleging that the plaintiff was possessed of a flouring mill in Will county; that the defendants, on the first day of May, 1853, and on divers other days, obstructed and diverted the water of the stream on which said mill was situated, by which plaintiff was injured.

The second count alleges that plaintiff was possessed of lots three, four, and five, block eighty-three, in West Lockport; and also of a part of the west fraction of the S. E. qr. of sec. 22, T. 36 N., R. 10 E.; that he was also possessed of the mills, dams, races, and other fixtures thereto belonging; that plaintiff had the right to enjoy and have the benefit of a certain stream or water course in Will county, for the purpose of

supplying said mills with water; that defendants, to prevent plaintiff from running said mills, on the first day of May, 1853, unlawfully deposited in said stream one hundred thousand bushels of corn cobs, and thereby filled up the bed of said stream and mill race, and prevented the water from running in its usual course to said mill. Damages, fifteen hundred dollars.

The defendants filed the general issue and two special pleas.

There was a trial by jury at December term of the Will Circuit Court, RANDALL, Judge, presiding.

William Gooding states that he resided at Lockport, Will county, since 1836; knew parties; knew Lockport mills; that Norton's mills were from one hundred to one hundred and sixty rods from plaintiff's mill; plaintiff's mill is on the Des Plaines river, below defendants'; defendants' mills on the canal basin in the village of Lockport; plaintiff in possession of mill in the summer of 1853.

Defendants had a corn-shelling machine attached to their mill; it was erected over, or close by the side of, the tail race, and below the machinery of the mill, and between that and the river; from location of shelling machine, think cobs would fall into or near the race; think they would require moving to get them into the tail race.

*Cross-Examined.* Saw-mill dam and race were built in 1836; cost of mill from $20,000 to $25,000, exclusive of land; that from the main channel of river there were thirty or forty rods of artificial race, made through a natural depression; defendants began the erection of their mill in 1852—completed it in spring of 1853; defendants' tail race is 200 or 250 feet long, or perhaps 300; distance from defendants' mill to river from 200 to 300 feet; race about twenty feet wide; defendants' mill most valuable; defendants' flouring mill in operation some time before corn sheller was attached.

Plaintiff's dam would not save all the water; the rack, I think, in the place where it was would draw substance into the race; if rack had been at the head of the race, it would probably have prevented the race from filling up, and kept the cobs off from the wheel; expense of placing rack at head of dam would not have been more than $25.

Lawrence L. Parker. Thinks plaintiff took possession of mill in question in 1852, in the spring—continued till fall of 1854; knew defendants' mill on the hydraulic basin in Lockport; saw defendants' corn sheller; it was erected directly over the tail race; saw it in operation two or three times; when in operation the cobs were deposited in the water of the tail race; that he had visited plaintiff's mill two or three times between the time the corn sheller was put up and the

32

5th of August; observed right away after the erection of the corn sheller that the cobs went from it directly into the Des Plaines river, and floated down into the mill pond of plaintiff; attention called to amount of cobs which had accumulated; plaintiff raked them up; there was a large quantity on the surface of the water, on the upper side of the boom; the boom was a stick of timber placed above the gate; pond covered with cobs; river covered also; at the end of the boom a larger deposit than above; should think there were 100,000 or 150,000 bushels of cobs in the pond, enough, if spread out, to cover three or four acres; this was in June, 1853. Two run of stone in operation at the time; there were three run in the mill; distance between plaintiff and defendants' mills about half a mile; no other corn sheller, to my knowledge, on Des Plaines river.

*Cross-Examined.* Considerable current down as far as the Little Islands; in an ordinary stage of water, river about eight rods wide; from where I stood should think the cobs extended fifteen rods up the race.

Samuel Black. Resided in Lockport in summer of 1853; knew plaintiff's and defendants' mills, and their relative situation; I am a miller by occupation; saw defendants' shelling machine in operation in August, 1853; it shelled pretty fast; worked in plaintiff's mill in 1853; commenced last of July or first of August; quit in September following; think I began work before 5th day of August; plenty of cobs in the race when I first went to plaintiff's mill; sometimes they extended twenty rods up the race; the deposit was from five to six feet deep; the water was drawn off once; the deposit was that deep at one spot; the cobs had to be worked through the rack and through the wheels to get rid of them; from the mill they were two or three feet deep along the right bank of the race; the water running through the rack, drew the cobs toward the rack; cobs accumulated at the rack so as to stop it from running to the wheels; we cleaned out the rack once as clean as we could; we then tried to see how long it would take to grind four bushels of wheat without removing the cobs; we were one hour and fifty minutes grinding it; when we started the mill it ground fast, but before we got through the head was lost and the flour poor; flour made under a light head is always inferior; at first the flour was good; the effect of the obstruction was, that we could not make as much or so good flour; think mill capable of grinding eight bushels per hour with each run of stone, with full head; when obstructed think there was water enough to operate one run of stone; on an average could run one run of stone twenty-four hours; sometimes could run two; mill, if

unobstructed, could grind forty barrels per day; after trying the experiment, at the expiration of the hour and fifty minutes, the cobs had accumulated as bad as at first; the cobs would float down to the booms at the head of the flume, become water-soaked, sink, work under the boom into the rack, and some of them through it; once took two sticks out of the rack to let off the cobs; the cobs would then draw into the wheel and fill it up; we then shut down head gates, went into the wheel and cleaned them out; a spout was made, but did not answer; I estimate the damage at twenty dollars per day.

Bernard Bershed sworn. Was employed as a hand for plaintiff in the mill in spring, summer, and fall of 1853; employed there in the months of May, June, July and August, constantly; cobs began to come the latter part of May or first of June, and continued to come down and obstruct the mill till September; the cobs came against the rack and would stop the water.

Plaintiff then rested his case. Defendants' counsel then moved the court to exclude evidence offered by plaintiff from the jury, on the ground that it did not tend to prove the cause of action alleged in the declaration; which motion the court sustained, and said evidence was excluded; whereupon the counsel for the plaintiff excepted to the opinion of the court, and the jury rendered a verdict for defendants. And afterward the plaintiff's counsel moved for a new trial on account of error in excluding plaintiff's evidence, which motion the court overruled and the plaintiff excepted.

NORTON & McROBERTS, and PARKS & ELWOOD, for Plaintiff in Error.

U. OSGOOD, for Defendants in Error.

SCATES, C. J. The only question is one of the relevancy of certain facts, as *tending* to prove the issue joined. Of this we can entertain no doubt. In constructing his shelling machine in such situation and manner as that the cobs discharged from it would fall into a running race, discharging itself into the river, and again entering the race to plaintiff's mill, by a current from the river into it, the defendants are chargeable with the consequences resulting from this known action of the current in combination with their own acts. And such combined effect is described with sufficient clearness and certainty, as the act of the defendants. We cannot favor technicalities tending rather to defeat than promote justice, and such as find no countenance or support in common sense, and common observation and experience. Had the cobs been discharged

Panton *v.* Norton et al.

by the machine into a dead pool, and been removed by an extraordinary flood and thrown into plaintiff's race, then, indeed, the defendants might not have been liable for the action of the elements. But here are constantly operating causes, by the laws of matter, producing certain effects or results. These we must presume to have been known to defendants. They knew that the current of the race would bear bodies lighter than water, into the river, and thence to plaintiff's race, and down it to his mill. When, therefore, they threw such bodies or substances into the water, or caused or allowed it to be done, the effect or consequence produced by the current, may be charged, in an action on the case, as the direct act of the party. As well might he plead his innocence, after preparing a fire on a boat, and setting that boat adrift in the current, that he did not burn his neighbor's mill below, into which the flames were carried by the boat drifting upon the current. I should not hesitate, under a direct charge of arson, to convict one who would thus knowingly and intentionally set a flambeau afloat. Neither do we here need stronger proof of the party's acts complained of as tending to prove their guilt.

We must hold defendants to the knowledge of the law of gravitation as a *truth*, and that water will flow down stream and bear along lighter bodies, as a *fact*, else defendants might use all the water, or detain it upon their premises, to the destruction of hydraulic works below, shielding themselves from responsibilities, on account of their ignorance.

But the law will presume such knowledge, and make the party responsible for the damage. So he shall not only answer for injuries from substances thrown by him upon its surface, but he shall in like manner answer for poisons and pollutions injurious to riparian proprietors lower down the stream. *Sic utere tuo non alienas lædas,* applies to the uses of water in purity, quantity, and with unobstructed power. Such is the principle by which we are protected from the corrupted stenches of certain trades which pollute the atmosphere. Offenders in this respect may not be heard to allege ignorance that odors disseminate upon the air. They shall answer a direct allegation of fact, as the same may be developed by the laws of nature.

The objection to the testimony was based upon a ground too technical for practical utility, nor do we know that we could make it more apparent by further illustrations.

The evidence not only tended to prove the direct allegation, but we do not see that any plainer, stronger, or more direct proof could have been offered.

Judgment reversed and cause remanded for new trial.

*Judgment reversed.*